UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

MICHELLE EMILY MOORE,                          Case No.: 3:10-CV-1526-AC

                    Plaintiff,                FINDINGS AND
                                                   RECOMMENDATION

      v.

COMMISSIONER of Social Security,

                    Defendant.

_____

ACOSTA, Magistrate Judge:

*Findings and Recommendation*

Plaintiff Michelle Emily Moore ("Moore") filed this action under section 205(g) of the Social Security Act (the "Act") as amended, 42 U.S.C. § 405(g), to review the final decision of the Commissioner of Social Security (the "Commissioner") who denied her social security disability insurance benefits ("Benefits").

Page 1 - FINDINGS AND RECOMMENDATION                          *{SIB}*

*Procedural Background*

On or about March 6, 2007, Moore filed an application for Benefits alleging an onset date of December 31, 2005. The application was denied initially, on reconsideration, and by Administrative Law Judge Gary L. Vanderhoof ("ALJ"), after a hearing. The Appeals Council received additional evidence in the form of a letter from Moore's attorney but denied review, and the ALJ's decision became the final decision of the Commissioner.

*Factual Background*

Moore is fifty-one years old and completed the eleventh grade. Her past relevant work experience includes motel housekeeper and telephone information clerk. Moore has not been involved in a successful work attempt since December 31, 2005. Moore alleges disability because of fibromyalgia, nerve damage, and pain. Moore last met the insured status requirements entitling her to Benefits on December 31, 2007.

I.  Claimant/Lay Witness Evidence

At the October 9, 2009, hearing, and in documents filed with the Commissioner, both Moore and her husband, Donald Moore ("Don"), testified about Moore's conditions, work history, daily activities and limitations. The evidence reveals Moore suffers from sharp pain on her left side from her rib cage to her lower hip which limits her ability to move, lift, and sleep. (Admin. R. at 198.) During the period at issue, Moore took time-released MS Contin three times a day and oxycodone for pain breakthroughs. (Admin. R. at 42-3.) At the time of the hearing, Moore was taking four medications daily – Ambien to help her sleep, oxycodone and Percocet for pain, and a muscle relaxant – and had been taking these medications for about two years. (Admin. R. at 38, 43.) The pain medication takes about twenty minutes to take effect and then Moore feels relief for about an

hour or two. (Admin. R. at 39.)  Moore described the medication as being helpful "sometimes" and complained that the pain medication affects her memory, concentration, and understanding.  (Admin. R. at 38, 211.)  She sees the doctor at least every three months to refill her prescriptions.  (Admin. R. at 38.)  In 2006, Moore received a series of nerve block injections for pain, which did not provide any relief.  (Admin. R. at 44-5.)  About the same time, she also received therapeutic injections for about six months, which were of some benefit to her.  (Admin. R. at 45.)  She stopped the therapeutic injections because "you can't do them forever."  (Admin. R. at 45.)

Moore testified that in 2001, she worked full time as lead housekeeper for the Rogue Valley Manor scheduling other housekeepers as well as cleaning houses herself. (Admin. R. at 39.)  In 2004 or 2005, Moore suffered from liver failure caused by taking too much Tylenol and was hospitalized at UC Davis for a week.  (Admin. R. at 40.)  Thereafter, she worked as a counter person in the family-owned muffler shop for about a year, until July 31, 2006, when the business went bankrupt. (Admin. R. at 34.)

As a counter person, Moore assisted customers, answered phones, made out bills, and handled money.  (Admin. R. at 35.)  The position was full time but Moore was unable to work full time due to pain in her ribcage that had increased over the years and worked its way down through her ribs and back.  (Admin. R. at 41.)  She tried to work for at least a couple of hours a day but had trouble answering the phones because she did not know the answers to the questions the customers asked and she could not stay on her feet for an extended period of time.  (Admin. R. at 46.)  She would leave the shop when she became exhausted or was in too much pain. (Admin. R. at 47.)  While working at the muffler shop, the heaviest thing Moore lifted was about twenty pounds. (Admin. R. at 35.)  Since then, she has done some housekeeping on her own, working about three

hours a week and lifting less than twenty pounds. (Admin. R. at 35-6.) If she cleans for five hours at a time, she is "wiped out" for the next two or three days. (Admin. R. at 201.)

Don testified that in December of 2005, he took Moore to UC Davis because her kidney had shut down as a result of all of the over-the-counter medication she was taking to alleviate her pain. (Admin. R. at 53.) After that, she was unable to work at the muffler shop for more than two or three hours a day due to the pain. (Admin. R. at 51-2.) She would go home and try to take a nap, or lay or sit down to watch television. Even when Moore was able to be at the muffler shop, she was not very helpful because the pain medication affected her "thinking abilities" and she was not able to remember things. (Admin. R. at 55-6.) Moore continued to attempt to work at the muffler shop because she wanted to work and could not hold down any other job. (Admin. R. at 56.)

At the time of the hearing, the Moores had been caring for two foster children, ages six and ten, for two years. (Admin. R. at 54.) Don was the primary care giver but Moore watched them while her husband was attending college or working part time at the juvenile corrections facility, generally on the swing or graveyard shift. (Admin. R. at 54.) Don testified that while he is at school or work, Moore tries to "clean a little here or there," or just sits and watches television. (Admin. R. at 56.) Don represented that Moore typically makes dinner and does the laundry, but that she is only able to work for about fifteen to thirty minutes before needing to sit down. (Admin. R. at 57.) When she is feeling better, she is able to work for an hour or two at a time but then she is "down" for the rest of the day, watching television or just sitting in the room. (Admin. R. at 57.) Don indicated that Moore can not lift more than ten to fifteen pounds, bend too many times, or reach very far without hurting, that she can only walk a half mile or less before resting, and that her memory and concentration are affected by her medications. (Admin. R. at 195.)

Page 4 - FINDINGS AND RECOMMENDATION                                    *{SIB}*

Don testified that Moore only gets three to four hours of sleep at night. (Admin. R. at 56.) When she wakes during the night, she takes some pain medications, plays solitaire on her iPhone, and then tries to lay down again. (Admin. R. at 57, 203.) Don feels that Moore has become depressed over the past two years. (Admin. R. at 56.) Moore admits to being depressed because she is unable to help Don they way she wants to, she does not like the way the pain medications make her feel, and she feels like she is now addicted to the pain medications. (Admin. R. at 203.)

Moore testified her pain is exacerbated by driving, sitting, and lying down. (Admin. R. at 41.) However, she has her drivers' license and drives to her normal activities, such as shopping, running errands, and taking her foster children to school. (Admin. R. at 49, 190.) She plans ahead and makes sure that the does not take her medications if she is going to be driving. (Admin. R. at 37, 49.) She shops once or twice a month with Don for an hour and a half to two hours. (Admin. R. at 37, 193.) The heaviest thing she lifts while shopping is a gallon of milk. (Admin. R. at 37.) She cares for the family dogs and cats, providing them food and water, and cleaning the cats' litter box. (Admin. R. at 207.) Once a week, she attempts to attend agility classes with the family dogs. Don had recently taken over the driving responsibilities for this activity because Moore was unable to drive herself home after working with the dogs for an hour. (Admin. R. at 57-8.) Moore also mows the yard once a month for about an hour. (Admin. R. at 208.)

The Moores no longer go camping because Moore can not get comfortable, even with an air mattress. (Admin. R. at 54.) Moore's only social activity is attending church on Sundays, where she makes coffee and helps serve donuts. Moore also helps with the church food pantry for an hour and a half every week on Wednesdays. (Admin. R. at 210.) She no longer reads or sews because her medications make her dizzy and she is unable to concentrate. (Admin. R. at 194, 199.)

Moore felt that she could lift twenty-five pounds but that she couldn't work for six hours in a day. (Admin. R. at 49-50.) Specifically, Moore indicated that she could walk or stand for one hour each during an eight-hour day before needing rest, could not sit for any period of time, and could bend and reach occasionally. (Admin. R. at 203.) She is able to walk for two miles before needing to rest for half an hour, which she does on occasion, and she can be up and active for one and a half or two hours before needing to rest. (Admin. R. at 200-01, 211.)

## II.  Medical Evidence

On December 28, 2003, Moore sought treatment at a medical center in Sacramento, California, complaining of light headedness, generalized weakness, and chronic left-sided rib pain. (Admin. R. at 242.) Moore reported a six-year history of left-sided rib pain which fluctuated from a one to a ten on the pain scale and had worsened over the previous two years, and that she had been diagnosed with fibromyalgia based on this pain. (Admin. R. at 242.) The pain was relieved by taking a deep breath and was worse while pressing on the ribs, at night, and in cold weather. (Admin. R. at 242.) There was no pain with touching of the skin. (Admin. R. at 242.) Moore was taking twelve to sixteen Tylenol 650 MG tabs for pain control and was admitted for acute liver failure caused by her excessive Tylenol use over a two-year period. (Admin. R. at 242.) Moore had tried but discontinued several prescription pain medications, such as Neurontin, which caused itching; Elavil, which caused urinary retention; Celebrex, which worked for only a short period of time; and Vicodin, which provided no more relief than Tylenol. (Admin. R. at 242.)

The first report from Moore's treating physician, Stephen L. Nelson, M.D., is dated January 17, 2005. Moore sought assistance from Dr. Nelson for pelvic pain lasting two years which had increased over the previous six months, a test for lyme's disease, and a refill of Ambien. (Admin.

R. at 339.)   Moore also reported continued pain in the left upper quadrant/chest described as "significantly bothersome."  (Admin. R. at 339.)  Dr. Nelson noted that Moore was in no acute distress, was alert and cooperative with normal mood, effect, attention span, and concentration. (Admin. R. at 339.) Dr. Nelson expressed concern that Moore was establishing tolerance to her pain medications resulting in worsening pain control.  (Admin. R. at 339.) He provided referrals to other physicians for assistance with both the pelvic and chest wall pain and continued her current medications. (Admin. R. at 337-9.)  Dr. Nelson's diagnoses were chronic pelvic pain, uterine leiomyoma, anterior chest wall pain, gastritis, and chronic insomnia.  (Admin. R. at 337, 339.)

Also in January 2005, Moore complained of rectal bleeding and abdominal pain to physicians at the Providence Medford Medical Center.  (Admin. R. at 245-46.)  A colonoscopy and endoscopy performed at that time were unremarkable and Moore was tentatively diagnosed with irritable bowel syndrome.   A month later, physicians at the same medical center completed a total abdominal hysterectomy with a bilateral salpingo-oophorectomy necessitated by severe fibroids.  (Admin. R. at 243, 270.)

Carl E. Osborn, D.O., examined Moore at the request of Dr. Nelson in February 2005.  Dr. Osborn described Moore's complaints as follows:

> Ms. Moore is a 44 year-old female with a primary complaint of left chest wall pain. Onset was approximately seven years ago without specific trauma or injury.  This began in the left front chest area underneath the left breast and was present for about two years in this location.  However, over the past five years she has had pain that has extended around the left chest from the anterior to the posterior ribs.  The pain may be described as sharp, stabbing or a throbbing toothache type pain.  It occurs intermittently on a daily basis and tends to be exacerbated or precipitated by pressure on the left side of the chest and is worse with cold.  Current medications include Oxycodone 5 mg 5-8 per day and MS Contin 60 mg b.i.d.  She apparently had x-rays of the thoracic spine done two years ago and has had x-rays of the left ribs as well and was told that there were no abnormalities.

(Admin. R. at 270.)  The examination revealed normal posture and AP curvatures, level iliac crests and shoulders, and no scoliosis.  (Admin. R. at 270.)  Muscle strength of the upper extremities was adequate and symmetrical and graded at 5/5 for all muscles tested while reflexes were 2/4 and symmetrical.  (Admin. R. at 270-71.)  Dr. Osborn observed the existence of pectus excavatum with distortion of the lower rib cage bilateral.  (Admin. R. at 271.)  He noted significant tenderness at the costochondral junction of the sixth rib on the left side anteriorly as well as tenderness over the costovertebral angle and laterally over the ribs from the sixth to the twelfth rib on the left side posteriorly.  (Admin. R. at 271.)  There was an absence of significant tenderness along the thoracic spine.  (Admin. R. at 271.)

Based on his examination, Dr. Osborn opined that Moore's anterior pain is primarily related to the costochondrial junction around the sixth rib, that she was likely predisposed to the pain due to the distortion of her rib cage, and that the posterior pain is primarily related to the myofascial attachments along the left posterior ribs.  (Admin. R. at 271.)   He diagnosed Moore with costochondritis, myofascial pain, and pectus excavatum.  (Admin. R. at 271.)  Dr. Osborn recommended a three to six month trial of "therapeutic injections with proliferant solutions" as well as anti-convulsants (other than Neurontin which she was unable to tolerate in the past) to decrease her pain and her reliance on narcotics.  (Admin. R. at 271.)

On March 3, 2005, Moore received her first therapeutic injections from Dr. Osborn but she reported to him that she had no improvement. (Admin. R. at 266-69.)  However, on March 14, 2005, Moore told Dr. Nelson that the injections seemed to help with her back pain but not her costochondritis-type pain.  (Admin. R. at 334.) Dr. Nelson noted that the hysterectomy had resolved the pelvic pain but that the extended time on the surgical table may have exacerbated her back pain.

(Admin. R. at 334.)  He instructed Moore to continue the therapeutic injections and the Dilantin, provided early refills of MS Contin and oxycodone, and asked her to return in a month.  (Admin. R. at 333.)  During this visit, Dr. Nelson described Moore as being in no acute distress, alert and cooperative, and with normal mood, affect, attention span, and concentration.  (Admin. R. at 333.)  Dr. Nelson noted Moore's chronic pelvic pain had seemingly resolved, and diagnosed her with minor costochondritis, myofascial pain, and pectus excavatum, the latter of which predisposed her to the previous two.  (Admin. R. at 333.) On March 29, 2005, Moore contacted Dr. Nelson's office complaining that her pain medications were not working and asking for a change.  (Admin. R. at 332.) She did not want to take more oxycodone but agreed to take two more that night.  When given the option to switch to Celebrex the following day, Moore declined and opted to increase her oxycodone prescription instead.  (Admin. R. at 332.)

On April 8, 2005, Dr. Osborn repeated the therapeutic injections, this time with positive results.  (Admin. R. at 266-67.)  Moore reported a "big difference" and less pain.  (Admin. R. at 264.)  She was able to drive with less frequent and less severe pain, and had gone three days with no rib pain at all.  (Admin. R. at 264.)  On May 4, 2005, Moore told Dr. Nelson that the injections were helping with the rib pain in her back but not her anterior rib pain and that she was in pain all of the time.  (Admin. R. at 331.)  She stated that she heard Dr. O'Sullivan did reconstructive surgery on the ribs and inquired whether such surgery might help her.  (Admin. R. at 331.)  Dr. Nelson recommended continuing the injections with Dr. Osborn and agreed to check with Dr. O'Sullivan about the possibility of surgical intervention.  (Admin. R. at 330.)  Again, Dr. Nelson described described Moore as being in no acute distress, alert and cooperative, and with normal mood, affect, attention span, and concentration.   (Admin. R. at 330.)   He continued his diagnoses of

costochondritis, myofascial pain syndrome, and pectus excavatum  (Admin. R. at 330.)  On May 5,

2005, Dr. O'Sullivan advised Dr. Nelson that he saw "nothing for an orthopedic evaluation" and

recommended referral to Dr. Greenburg or Dr. Osborn for chronic pain.  (Admin. R. at 329.)

Moore received therapeutic injections on June 16, 2005, at which time she reported that her

spine was "much better", that her rib pain was not as severe, and that she was suffering less pain

while driving.  (Admin. R. at 248.)  On June 20, 2005, Dr. Nelson approved an early refill of

oxycodone to help alleviate the additional pain caused by the therapeutic injections.  (Admin. R. at

326.)  On June 29, 2005, Moore informed Dr. Nelson that she is continuing to slowly improve with

the therapeutic injections and that she was sleeping well with her Ambien.  (Admin. R. at 321.)  Dr.

Nelson agreed with Dr. Osborn that additional therapeutic injections were appropriate and asked

Moore to return for a follow-up in four weeks.  (Admin. R. at 321.)  As in the past, Dr. Nelson

described Moore as being in no acute distress, alert and cooperative, and with normal mood, affect,

attention span, and concentration.   (Admin. R. at 321.)   He continued his diagnoses of

costochondritis and pectus excavatum, discontinued his diagnosis of myofascial pain syndrome, and

added diagnoses of hot flashes and constipation.  (Admin. R. at 322.)  On July 11, 2005, Moore

requested an increase in the strength of her Ambien prescription due to the fact that her insurance

did not cover more than fourteen pills per month.  (Admin. R. at 323.)

On July 14, 2005, Moore reported to Dr. Osborn that she was "doing pretty good" and "using

less pain meds."  (Admin. R. at 261.)  Her pain had started returning just before her July injection

but was not as bad.  (Admin. R. at 261.)  At the time of her therapeutic injections on August 11,

2005, Moore stated that she was "feeling great", had "cut her pain meds in half", and was sleeping

through the night for the first time in years.  (Admin. R. at 258.)  Again, she reported that the pain

had just started returning a couple of days before.  (Admin. R. at 258.)  Two weeks later, Moore advised Dr. Nelson by telephone that she wanted to decrease her MS Contin prescription from 60 mg to 30 mg and requested a refill of the MS Contin and oxycodone, which she received.  (Admin. R. at 318.)

On August 26, 2005, Moore visited Dr. Nelson complaining only of low abdominal pain and difficulty urinating, with some low-grade fevers and back pain.  (Admin. R. at 316.) Despite a normal urine culture, Moore returned two days later with complaints of inability to empty or control her bladder, and frequent nighttime urination.  (Admin. R. at 312.)  Dr. Nelson treated Moore for a possible urinary tract infection with antibiotics, opined that Moore might have a bladder prolapse, and recommended pelvic prolapse exercise therapy.  (Admin. R. at 310.)  Once again, Dr. Nelson described Moore as being in no acute distress, alert and cooperative, and with normal mood, affect, attention span, and concentration.  (Admin. R. at 309, 313.)  During this period, he diagnosed Moore with only female prolapse and a minor urinary tract infection.  (Admin. R. at 310.)

On September 27, 2005, at the time of her next therapeutic injections, Moore represented that the injections were doing her "a lot of good", that the "pain was much less then previous" and was limited to her left anterior ribs.  (Admin. R. at 256.)  About the same time, Moore reported to Dr. Nelson that "overall she is doing fair."  (Admin. R. at 307.)  Her therapy for her bladder prolapse seemed to stir up some rib discomfort and she had to increase her pain medication but it was still well below where it was before.  (Admin. R. at 307.)  At this time, Dr. Nelson observed that Moore was in no acute distress, was alert and cooperative, and had normal mood, affect, attention span, and concentration.  (Admin. R. at 306.)  He returned to his diagnoses of costochondritis, anterior chest wall pain, chronic pelvic pain, and minor constipation.  (Admin. R. at 306.)

Page 11 - FINDINGS AND RECOMMENDATION                                                    *{SIB}*

At Moore's request, Dr. Nelson wrote a letter to her insurance company in October 2005. The insurance company had denied Moore's request for coverage for the therapeutic injections, indicating they needed to know reason for the injections and how they benefit her. (Admin. R. at 304.) Moore informed Dr. Nelson that the physical therapy was making her costochondritis pain worse and that her therapist was considering recommending a nerve block. (Admin. R. at 303.) The diagnoses of costochondritis, anterior chest wall pain and chronic pelvic pain remained. (Admin. R. at 302.) The following month, Moore reported that she "doing fairly well" overall. (Admin. R. at 300.) She was no longer receiving therapeutic injections because her insurance denied further payment but she felt her ribs were still slightly better. (Admin. R. at 300-01.) The physical therapy was also helping her pelvic discomfort. (Admin. R. at 300.) Dr. Nelson offered the possibility that Moore may have fibromyalgia which could be contributing to her symptoms, to which Moore responded that she had tried Mirapex in the past and it was not helpful. (Admin. R. at 300.) In notes from both October and November 2005, Dr. Nelson indicated that Moore was in no acute distress, was alert and cooperative, and had normal mood, affect, attention span, and concentration. (Admin. R. at 301-2.) As of November 2005, Dr. Nelson diagnosed Moore with costochondritis, pectus excavatum, and chronic pelvic pain. (Admin. R. at 301.)

In mid-December, 2005, Moore told Dr. Nelson that her ribs were "about the same to possibly slightly better with [physical] therapy." (Admin. R. at 286.) Moore had decided to pay for therapeutic injections herself as they were more helpful to her. (Admin. R. at 286.) She reported increasing her MS Contin intake, requested a change from oxycodone to Vicodin, to which Dr. Nelson agreed, and asked if there were medications other than Mirapex or Neurontin that might be helpful. (Admin. R. at 285-6.) Again, Dr. Nelson reported that Moore was in no acute distress, was

Page 12 - FINDINGS AND RECOMMENDATION                                    *{SIB}*

alert and cooperative, and had normal mood, affect, attention span, and concentration.  (Admin. R. at 285.)  He diagnosed Moore with costochondritis, anterior chest wall pain, myofascial pain syndrome, and an accidental Tylenol overdose.  (Admin. R. at 385.) Moore received additional therapeutic injections on December 27, 2005.  (Admin. R. at 254).  At that time, she reported doing well until starting physical therapy a few weeks prior which had increased her pain symptoms. (Admin. R. at 254.)

Moore informed Dr. Nelson early in 2006 that she was doing about the same but then indicated that she felt she was right back where she started.  (Admin. R. at 283.)  The physical therapy helped, but only for about a day.  (Admin. R. at 283.)  Dr. Osborn was addressing some new spots with therapeutic injections.  Moore's insurance company had refused to pay for Lyrica and had expressed an interest in a change of Moore's Ambien prescription.  (Admin. R. at 283.)  Dr. Nelson observed that Moore was in no acute distress, was alert and cooperative, and had normal mood, affect, attention span, and concentration.  (Admin. R. at 284.)  He continued his diagnosis of costochondritis, and returned to his diagnoses of myofascial pain syndrome and uterine leiomyoma. (Admin. R. at 284.)  Moore returned to Dr. Osborn for therapeutic injections in late February 2006 and reported that she had  been doing well for six to seven weeks before her pain increased.  (Admin. R. at 251.)

On March 29, 2006, Moore stated that her rib pain had gotten worse; that while she continued to get therapeutic injections from Dr. Osborn every three months, she was not sure if it was helping that much; that her medication stops the pain but then it comes back; that she had not tried the Lyrica, and that she thought the MS Contin might be exacerbating her bladder problems.  (Admin. R. at 282.)  Dr. Nelson added a prescription for Lyrica to allow Moore to control her pain while

decreasing her use of MS Contin, and continued her prescription for Norco.  (Admin. R. at 280.)

At that time, Dr. Nelson reported that Moore was in no acute distress, was alert and cooperative, and

had normal mood, affect, attention span, and concentration.  (Admin. R. at 281.)  His diagnoses at

this time were  costochondritis, anterior chest wall pain, and myofascial pain syndrome.  (Admin.

R. at 281.)

On April 14, 2006, Moore complained that the Lyrica was not working very well and she was

having trouble tolerating the Norco.  She asked if she could increase her Lyrica prescription to offset

the decrease in her MS Contin prescription and switch back to oxycodone in the place of Norco, to

which Dr. Nelson complied.  (Admin. R. at 278.)  Again, Dr. Nelson observed that Moore was was

in no acute distress, was alert and cooperative, and had normal mood, affect, attention span, and

concentration.  (Admin. R. at 277.)  The prior diagnoses of anterior chest wall pain and myofascial

pain syndrome remained, and the diagnosis of bacteriuria was added.  (Admin. R. at 277.)

Moore had her last therapeutic injections on June 23, 2006, at which time she reported that

changes to her pain medications were not helpful and that she had developed increasing chest wall

pain.  (Admin. R. at 247.)  At that time, she was taking Percocet, Ambien, and Estradiol.  (Admin.

R. at 247.)  On June 28, 2006, Moore saw Dr. Nelson for additional pain medications and seeking

a referral to Dr. Sills for pain management.  (Admin. R. at 275.)  Moore had suffered an increase in

pain which seemed to result from traveling by car to California to visit relatives, had taken extra

medication to combat this pain, and had run out of pain medication. (Admin. R. at 275.)  Moore

reported that her therapeutic injections helped for about six months but that the recent injections had

caused swelling in the left axillary region.  (Admin. R. at 275.)   She also indicated that she had

stopped taking MS Contin and had cut her Percocet in half. (Admin. R. at 276.)  Dr. Nelson

increased the Percocet prescription to decrease Moore's reliance on Tylenol and initiated a referral to Dr. Sills. (Admin. R. at 275.)  As in the past, Dr. Nelson noted that Moore was in no acute distress, was alert and cooperative, and had normal mood, affect, attention span, and concentration. (Admin. R. at 275.)  He diagnosed Moore with anterior chest wall pain and myofascial pain syndrome at this visit. (Admin. R. at 276.)

Shawn Sills, M.D., examined Moore on August 23, 2006.  At that time, Moore described pulsing and penetrating left-sided chest pain, which had been present for fourteen years with an increase in severity over the last six years. (Admin. R. at 347.)  Moore explained that Percocet will occasionally reduce her pain and that therapeutic injections alleviate her pain to a degree. (Admin. R. at 347.)  Dr. Sills observed that Moore was in no acute distress, was able to ambulate without assistance, and that she was not accompanied by anyone. (Admin. R. at 347.)  On examination, he noted tenderness to palpation in the back and left chest wall, both post and anteriorly, in the area of T6, T7, and T8, with no tenderness around the abdominal wall.  (Admin. R. at 347.)  He opined that Moore "may have chronic intercostal neuralgia or possible thoracic radiculopathy" and recommended a trial of Lidoderm patches and a series of intercostal nerve blocks. (Admin. R. at 347-8.)  An MRI taken on August 25, 2006, revealed very mild degenerative disc disease with no compression fracture, spinal stenosis, or significant foraminal narrowing.  (Admin. R. at 343.)

In early September 2006, Moore complained to Dr. Nelson that she was always needing an early refill of her medications due to her pain and that she was taking six to seven Percocet per day. (Admin. R. at 374.)  She was scheduled for nerve block injections later that month and was hoping to decrease her Percocet use, and had already decreased her MS Contin use without any problems. (Admin. R. at 374.)  Dr. Nelson made the diagnoses of costochrondritis and rib dysfunction at this

time. (Admin. R. at 374.)

On September 14, 2006, Moore received intercostal nerve block injections at T10, T11, and T12 ribs on the left side. (Admin. R. at 354.) Moore received total relief for about twelve hours and returned for more injections on September 19, 2006. (Admin. R. at 356.) On September 28, 2006, Moore reported 100 percent relief immediately followed by overall relief but with some pain below the injection site. (Admin. R. at 358.) At Moore's request, and upon finding tenderness at L1, L2, and T12, Dr. Sills administered nerve block injections at these locations. (Admin. R. at 352.) Dr. Sills repeated the injections at these sites on October 19, 2006. (Admin. R. at 352.) On November 1, 2006, Moore reported that she did not obtain relief from the latter two sets of injections and that she currently had sharp, pressure-like pain at a level from four to eight on a scale of ten over the left side of her chest into the ribs in her lower back. (Admin. R. at 350.) The pain was exacerbated by lying down, sitting, and riding in a car. (Admin. R. at 350.) Moore indicated that she did find relief with medication but that Lyrica and Neurontin were previously unsuccessful. (Admin. R. at 350.)

Dr. Sills opined that Moore's pain was "consistent with intercostal neuralgia most likely effecting the T11 T12 spinal nerves." (Admin. R. at 350.) He noted the absence of success with the nerve block injections and recommended a trial of Cymbalta. (Admin. R. at 351.) He also briefly discussed alternative treatments, such as a spinal cord stimulator, a pulsed RF of the thoracic dorsal root ganglion based on the transient pain relief following left T10, T11, T12 nerve blocks, and an interathecal pain pump trial as a last resort. (Admin. R. at 351.) At this time, Dr. Sills again indicated that Moore was in no acute distress, was able to ambulate without assistance, and was not accompanied by anyone. (Admin. R. at 350.)

The following week, Moore informed Dr. Nelson that her pain had increased with the bad weather, her trial with Cymbalta was unsuccessful, she was taking nine Percocet a day and needed a refill, and she was considering alternative treatments with Dr. Sill. (Admin. R. at 372.) Dr. Moore diagnosed Moore with chest wall pain and neuralgia. (Admin. R. at 372.)

In January 2007, Moore reported to Dr. Nelson that she as no longer treating with Dr. Sills and that she had decreased her intake of Oxycontin because of urine retention. (Admin. R. at 370.) A month later, Moore requested an increase in her Percocet prescription and a less expensive alternative to her Ambien prescription. (Admin. R. at 369.) Dr. Nelson's diagnoses during this time were chest wall pain, rib dysfunction, and myofascial pain. (Admin. R. at 369.)

On April 2, 2007, Moore informed Dr. Nelson that she was cleaning two houses a week, one on Tuesday and one on Friday, for two to three hours at a time. (Admin. R. at 368.) Dr. Nelson continued his diagnoses of chest wall pain, myofascial pain, and rib dysfunction. (Admin. R. at 368.) The two discussed paperwork related to Moore's application for Benefits. (Admin. R. at 368.) A few days later, Dr. Nelson authored a letter in response to a request from the Commissioner for information regarding Moore's physical limitations. In the letter, dated April 6, 2007, Dr. Nelson indicated that Moore was able to sit for thirty minutes, stand and walk for one to two hours, lift ten to twenty pounds occasionally, carry ten to twenty pounds, and handle objects with no limitation except for possible carpal tunnel on the right. Moore's ability to travel, understand and remember, sustain concentration, persist, socially interact and adopt was not limited other than by pain. (Admin. R. at 366.) Moore's speech and hearing were not limited in any way. (Admin. R. at 366.) A second version of the letter found in the record contains handwritten notations that Moore was only able to sit in thirty minute intervals and stand and walk for one to two hour intervals per week.

(Admin. R. at 383.)

On April 28, 2007, Jason Muir, M.D., interviewed and examined Moore for about thirty minutes. It is evident from his notes that he also reviewed at least some of her medical records. (Admin. R. at 360.) Based on this information, Dr. Muir concluded that Moore suffers from "[i]ntercostal pain on the left thoracic region that does not have neuropathic features on examination." (Admin. R. at 364.) He felt that the pain complained of by Moore was not a neuropathic-type pain based on the absence of reports of irritation by normal or light touch, irritation by clothing, a waxing/waning or worsening at night, sensory loss or allodynia. (Admin. R. at 364.) Dr. Muir explained that:

> Although the claimant alleges severe back pain localizing to the left thoracic area in a very focal distribution, this pain should not be limiting to her ability to sit, stand, walk or bend. The claimant describes that the pain is actually worse when she does no movement as opposed to doing movements. Objective evidence does not support the claimant's allegations either. The claimant's allegations of pain, likely described as neuropathic has no features of a neuropathy though there are certain situations where neuropathy would not have any features outside of pain. This would not typically be true. Additionally the claimant has no findings including sensory loss or sensory change in that location. She has no allodynia in that location. It is all subjective pain complaints. This makes the examination of the claimant difficult since her neurologic examination is relatively intact. She has no upper or lower motor neuron signs. Her range of motion examination is also intact with full range of motion in the affected areas.
>
> The claimant would have no restrictions in terms of standing, walking, sitting, or bending. She is thin, however, and would be capable of lifting 25 pounds occasionally and 10-20 pounds frequently. She has no postural or manipulative limitations.

(Admin. R. at 364-5.) During the examination, Dr. Muir observed that:

> The claimant is a 46-year old female in no acute distress. She is emotionally stable. She is not disheveled. She is easily able to transfer from the chair to the examination table. She sits comfortably and is able to take her shoes off with difficulty. She is able to walk to examination room without difficulty. There is no evidence of poor

effort or inconsistencies.

(Admin. R. at 362.)

After reviewing Moore's medical records at the request of the Commissioner, Martin A. Kehrli M.D., diagnosed Moore with disorders of muscle, ligament, and fascia on May 22, 2007, 2007.  (Admin. R. at 63.)  However, he did not consider her disabled as a result of the diagnosis or related limitations.  (Admin. R. at 63.)  On December 18, 2007,  Neal Berner M.D., similarly reviewed the records and found that Moore suffered from mild degenerative disc disease of the thoracic spine but was not disabled through that date, confirming Dr. Kehrli's determination. (Admin. R. at 64.)

On July 27, 2009, Dr. Nelson authored a letter addressed to "To Whom It May Concern" which read:

> I write this letter on behalf of my patient, Michelle E. Moore, in an attempt to explain my view of the medical conditions which limit or eliminate her ability to sustain work like activities and to support her application for social security benefits.
>
> I discussed Ms. Moore's case with her attorney and understand that the Administration is uncertain if Ms. Moore suffers from a significant medical condition that would explain her symptoms.  In my opinion, she certainly does.  I have been Ms. Moore's primary care provider for the last ten years.  As the result of my review of my own chart notes and the examinations and laboratory tests performed by others I believe that Ms. Moore suffers from pectus excavatum, chostochondritis [sic] and fibromyalgia that cause symptoms that would make it very difficult for her to work at any job that would require regular and sustained attendance.
>
> During the period of time that I have treated Ms. Moore she has provided a history of a number of systemic problems with the primary symptoms consisting of unremitting chest and mid back pain and fatigue.  My clinical examinations have documented trigger points, tenderness and decreased mid back motion.  The existence of pectus excavatum is readily observed.  Pectus excavatum, or the malformation of cartilage joining the ribs to the breastbone, is a congenital or developmental condition which leaves the patient with what appears to be a sunken chest.  Though many patients who suffer from this disorder have no symptoms,

others suffer from fatigue, chest pain, shortness of breath or tachycardia.  Ms. Moore has certainly complained of fatigue and pain which could be the result of her pectus excavatum condition.

Due to the malformation of the juncture of the ribs and breastbone, the cartilage connecting those structures can become inflamed both acutely and chronically. Clinical findings of tenderness establish the inflammation [of] the rib/sternum cartilage that is costochondritis.

Ms. Moore also presents with problems that fit the diagnosis of fibromyalgia.  She has tender points in all four quadrants and in at least 11 of 18 locations necessary to support a diagnosis of fibromyalgia.  Ms. Moore also complains of and presents with the cognitive dysfunction associated with the diagnosis consisting of problems with concentration, multitasking, some memory disturbances and anxiety.   She also experiences fatigue and has had longstanding sleep disturbances and bowel problems that are part of the fibromyalgia syndrome.

Ms. Moore has readily submitted to a number of procedures to try to secure some relief from her constant pain including diagnostic and therapeutic nerve blocks administered by pain specialist, Dr. Sill, in her thoracic and upper lumbar spine and prolotherapy injections carried out with Dr. Osborne [sic].  Unfortunately, none of the procedures have lead to any long term relief of her pain, cognitive dysfunction, sleep disturbance or bowel problems.    In addition to readily undergoing recommended treatment, Ms. Moore has tried to return to work in a couple of different low stress, non-regular work type jobs on a number of occasions only to have to discontinue the activities.  I watched Ms. Moore's condition worsen as she attempted to work cleaning houses on a part time basis in 2007.  She presented not only complaining of more pain but also in a more disheveled and anxious state.  I am also aware that she tried to work for a family member in an office setting on a part time basis but was unable to maintain sufficient persistence in the task to be of assistance to the business.

Ms. Moore's motivation to overcome her problems and continue working [is] also demonstrated by her resistance to use narcotic pain medications until after the use of Tylenol lead to liver problems.  She also has not well tolerated Neurontin and Elavil, which cause urine retention.  Over the last five years or so, we have been attempting to treat Ms. Moore's symptoms with unfortunately increasing doses of Oxycodone, Dilantin, and MS Contin, as well as Ambien for sleep.  The pain medications can decrease mental acuteness and worsen fatigue.

In April, 2007 I provided a letter setting forth what I believed Ms. Moore's maximum abilities for work would be.  I did not believe [then] and in hindsight certainly do not believe now that she would be able to sustain any level of work on a regular eight

hour a day, five day a week basis. Too many factors, including her activities of the day before, the quality of the sleep she had the night before, stress and the temperature of weather, can contribute to a decrease in her abilities to allow Ms. Moore to regularly sustain activity.

I hope this information is of assistance in determining the nature of Ms. Moore's problems.

(Admin. R. at 385-6.)

Dorothy A Leong, M.D., testified at the hearing as a medical expert at the request of the Commissioner. After reviewing all of Moore's medical records, with the exception of some records identified at the hearing relating to various injections administered to Moore to alleviate her pain, Dr. Leong determined that Moore did not meet or equal any of the Commissioner's listings and that during the relevant period from December 31, 2005, to December 31, 2007, Moore retained the ability to lift and/or carry twenty-five pounds occasionally and ten pounds frequently and to sit for six hours in an eight-hour work day. (Admin. R. at 28.) Moore should not climb ladders, ropes, scaffolds, or work in unprotected heights, but had no environmental restrictions. (Admin. R. at 28.)

Dr. Leong did not disagree with Dr. Nelson's diagnosis of fibromyalgia but noted that cognitive dysfunction was not typically related to this diagnosis. (Admin. R. at 30.) She also questioned a number of Dr. Nelson's diagnoses and limitations noting that they were not supported by objective findings in the record. (Admin. R. at 31.) She indicated that there had been a lot of diagnoses but no one had established a clear etiology for Moore's ongoing complaints of pain. (Admin R. at 31.) She noted an MRI did not reveal any type of impingement of the nerve root, which might have supported a radicular-type pain pattern. (Admin. R. at 32.) She did not dispute the congenital chest wall diagnosis but explained that it was a cosmetic condition which really would not have any impact on Moore's physical abilities. (Admin. R. at 32.)

Page 21 - FINDINGS AND RECOMMENDATION                    {SIB}

III.  Vocational Evidence

Vocational expert, Kent Granat, appeared and testified at the hearing at the request of the

Commissioner.  The ALJ posed the following hypothetical:

> I would like you to assume an individual alleging disability at age 45, she was 47 at
> her date last insured, Title II Claim only, younger age individual.  Her past relevant
> work history is not in the E section of the exhibit file.  I'm going to set forth several
> hypothecs.  First of all, I'd like you to assume this individual could lift and carry 25
> occasionally, and ten frequently.  Stand, sit and/or walk each six of an eight-hour day,
> provided she would have normal breaks.  She would be precluded from climbing
> ladders, ropes, or scaffolds, or working at unprotected heights.  I had no non-
> exertional limitations at this point in time.

(Admin. R. at 58-9.)  When asked whether these limitations would prevent Moore from engaging

in her past relevant work, Granat opined that, based on this hypothetical, Moore retained the ability

to work as a housekeeping cleaner, which he classified as a light, unskilled job, and as a

counterperson, which he classified as a sedentary, unskilled job..  (Admin. R. at 59.)   Granat

testified that even with these unskilled positions, if an employee missed more than a couple days of

work a month for whatever reason, such absenteeism would be considered excessive and would

result in termination.  (Admin. R. at 60.)   The same result would occur if an employee was present

at work but unable to work a full eight-hour day due to debilitating pain or side effects from

medication which required frequent breaks to lie down or rest.  (Admin. R. at 61.)  However, Granat

acknowledged that working for a couple of hours at a time with two fifteen-minute breaks and a half-

hour lunch, plus short breaks to get some water or use the restroom, were customary in the industry.

(Admin. R. at 60-1.)

V.  ALJ Decision

In his opinion, the ALJ acknowledged that Moore worked eight hours a week in the family

business from January 2006 until the business closed on August 1, 2006, and that she thereafter worked part time as a housekeeper. However, he determined that none of this conduct qualified as substantial gainful activity during the relevant period from December 31, 2005, to December 31, 2007. (Admin. R. at 12.) The ALJ found Moore to have the severe impairments of costochondritis and myofascial pain syndrome based on her long-term complaints of left-sided rib pain and the conservative treatment provided for these conditions. (Admin. R. at 12.) He felt these impairments did not meet or equal a listed impairment. (Admin. R. at 13.) The ALJ considered Moore to be capable of light work with the additional limitations of no climbing of ladders, ropes or scaffolds, and no work at unprotected heights. (Admin. R. at 13.) He found her capable of lifting twenty-five pounds on occasion and ten to twenty pounds frequently. (Admin. R. at 15.) Based on these limitations, the ALJ found Moore capable of performing her past relevant work as a motel housekeeper and telephone information clerk and, therefore, not disabled. (Admin. R. at 16-17.)

The ALJ discounted the diagnoses and limitations set forth by Dr. Nelson in his letters of April 2, 2007, and July 27, 2009, finding Dr. Moore's opinion that claimant's condition has remained consistent and that she is not able to work full-time contradicted by the evidence that Moore was working cleaning houses through April 2007. (Admin. R. at 15.) He also relied on the absence of appropriate diagnostic tests or evidence supporting Dr. Nelson's diagnoses, and noted that the only diagnostic study available was an MRI which showed evidence of very mild degenerative disc disease of the thoracic spine. (Admin. R. at 15.)

The ALJ also rejected Moore's testimony regarding her long-standing complaints of pain, finding that they were not consistent with neuropathic features. He explained that based on Moore's reports, the pain was not irritated by normal or light touch, clothes did not irritate it, and it did not

wax and wane or worsen at night, all of which are typical for pain related to distal nueropathies. (Admin. R. at 15.)  He opined that the objective evidence found in the record did not support claimant's allegations, all of which were subjective.  (Admin. R. at 15.)

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

> * * *

> She does have some limitations and the undersigned considered these in assessing her functional capacity.  Nevertheless, the record evidence fails to support her subjective complaints, including pain, of such severity as to be disabling under the regulations for determining disability.   Medical expert testimony supports this assessment. Likewise, the state agency medical consultants determined that the claimant's condition did not place any significant restrictions on her ability to stand, walk, sit, lift or carry, and therefore she did not meet the criteria for disability according to Social Security regulations.  The undersigned concurs with this assessment in light of the objective medical evidence of record.

(Admin. R. at 16.)  He specifically rejected Moore's claim that her medical condition would cause her to miss work on a frequent basis and that she would need to take unscheduled breaks during the workday.  (Admin. R. at 17.)

### Standard of Review

The Act provides for payment of various benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability.  42 U.S.C. § 423(a)(1). The burden of proof to establish a disability rests upon the claimant.  *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir.), *cert. denied*, 519 U.S. 881 (1996).   To meet this burden, the claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a

continuous period of at least twelve months.  42 U.S.C. §§ 423(d)(1)(A).  An individual will be determined to be disabled only if there are physical or mental impairments of such severity that the individual is not only unable to do previous work but cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. §§ 423(d)(2) (A).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for Benefits because he or she is disabled.  20 C.F.R. §§ 404.1520; *Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995).  First, the Commissioner determines whether the claimant is engaged in "substantial gainful activity."  If the claimant is engaged in such activity, benefits are denied.  Otherwise, the Commissioner proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c).  If the claimant does not have a severe impairment or combination of impairments, benefits are denied.

If the impairment is severe, the Commissioner proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the Commissioner proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant has performed in the past.  If the claimant is able to perform work which he or she has performed in the past, a finding of "not disabled" is made and

benefits are denied.  20 C.F.R. §§ 404.1520(e).

If the claimant is unable to do work performed in the past, the Commissioner proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his or her age, education, and work experience.  The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. *Distasio v. Shalala*, 47 F.3d 348, 349 (9th Cir. 1995).  The claimant is entitled to benefits only if he or she is not able to perform other work.  20 C.F.R. §§ 404.1520(f).

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g) (2006); *Batson* v. *Comm'r of the Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." *Robbins* v. *Soc. Sec. Admin.,* 466 F.3d 880, 882 (9th Cir. 2006).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Tylitzki* v. *Shalala,* 999 F.2d 1411, 1413 (9th Cir. 1993).

The reviewing court may not substitute its judgment for that of the Commissioner.  *Robbins,* 466 F.3d at 882; *Edlund v. Massanari,* 253 F.3d 1152, 1156 (9th Cir. 2001).  Thus, where the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld, even where the evidence can support either affirming or reversing the ALJ's conclusion. *Burch v. Barnhart,* 400 F.3d 676, 679 (9th Cir. 2005).  The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995).  In determining a claimant's residual functioning capacity, an ALJ must consider all relevant evidence in the record, including, *inter alia,* medical records, lay

evidence, and "the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins,* 466 F.3d at 883, *citing* SSR 96-8p, 1996 WL 374184, at *5; 20 C.F.R. §§ 404.1 545(a)(3), 416.945(a)(3); *Smolen v. Chater,* 80 F.3d 1273, 1281 (9th Cir.1996). However, the reviewing court must consider the entire record as a whole, weighing both the evidence that supports and detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence. *Lingenfelter v. Astrue,* 504 F.3d 1028, 1035 (9th Cir. 2007).

*Discussion*

Moore asserts the ALJ erred by: 1) improperly rejecting the opinion of Dr. Nelson, Moore's treating physician; 2) improperly discounting Moore's testimony; 3) totally ignoring evidence from Moore's husband; and 4) posing an improper hypothetical to the vocational expert. Moore asks the court to credit the testimony discounted or rejected by the ALJ and remand this action to the Commissioner for an award of Benefits. The Commissioner contends the ALJ properly considered the evidence presented to him in accordance with the terms of the Act and the related regulations, and that his decision should be affirmed.

I.  Dr. Nelson's Opinion

Moore argues that the ALJ improperly rejected Dr. Nelson's statements regarding Moore's limitations and his opinion that she was not able to work full time at any job during the relevant period. The weight attributable to the opinion of a medical source depends, in part, on the professional relationship between the physician and the claimant. Generally, a treating physician's opinion carries more weight than an examining physician's opinion, and an examining physician's opinion carries more weight than that of a physician who did not examine the claimant but formed

an opinion based on a review of the claimant's medical records. *Holohan v. Massanari*, 246 F.3d 1195, 1201-1202 (9th Cir. 2001).

The ALJ can reject a treating or examining physician's opinion that is inconsistent with the opinions of other treating or examining physicians, if the ALJ makes findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). An uncontradicted opinion may be rejected only for clear and convincing reasons. *Thomas*, 278 F.3d at 956-957. The opinion of a non-examining physician by itself does not constitute substantial evidence to reject the opinion of a treating or examining physician. *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1996). It may constitute substantial evidence if it is consistent with other evidence in the record. *Magallanes v. Bowen,* 881 F.2d 747, 752 (9th Cir. 1989).

An ALJ need not accept a physician's opinion that is brief, conclusory or inadequately supported by clinical findings. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216. Additionally, if a claimant is found not credible, an ALJ may appropriately disregard statements the claimant made to his physicians. *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001).

Here, Dr. Nelson's opinion that Moore is unable to work full-time, is limited to sitting for half hour intervals and standing or walking for one to two hours intervals, and may only lift only ten to twenty pounds occasionally, is contradicted by the opinion of examining physician Dr. Muir, and non-examining physicians Dr. Kehrli, Dr. Berner, and Dr. Leong. Dr. Muir specifically found that Moore's "pain should not be limiting to her ability to sit, stand, walk or bend", that she "would have no restrictions in terms of standing, walking, sitting, or bending", and that she is "capable of lifting 25 pounds occasionally and 10-20 pounds frequently." (Admin. R. at 364-5.) Dr.'s Kehrli, Berner,

Page 28 - FINDINGS AND RECOMMENDATION                    *{SIB}*

and Leong all reviewed Moore's medical records and determined that while she suffered from disorders of the muscles, ligaments, and fascia in her back, as well as mild degenerative disc disease, she was not disabled as a result of these conditions. Accordingly, the ALJ need only set forth specific, legitimate reasons for rejecting Dr. Nelson's testimony that are based on substantial evidence in the record.

The ALJ construed Dr. Nelson's letters to state that Moore's condition had remained consistent over the ten years he treated her and that she was not able to work full time during this period due to pain and fatigue. He then rejected this conclusion based, in part, on the fact that it was contradicted by evidence that Moore was still cleaning houses in April 2007. Moore argues that this justification is not supported by the record because Moore testified at the hearing that after she stopped working full time at the family business, she cleaned only one house on one occasion and spent only three hours doing that. However, Moore reported to Dr. Nelson on April 2, 2007, that she was cleaning two houses a week, one on Tuesday and one on Friday, for two to three hours at a time. Just four days later, Dr. Nelson authored the first letter in which he stated that Moore was only able to stand and walk for one to two hour intervals either at a time or per week, depending on the version of the letter considered. Dr. Nelson's limitations in this letter are clearly inconsistent with Moore's representation to him that she worked two to three hours at a time twice a week. The ALJ's reason for rejecting Dr. Nelson's opinion is supported by the record.

The ALJ also found that Dr. Nelson's assessment of Moore's ability to engage in work-related activities was not supported by objective medical evidence in the record. The only diagnostic test found in the record related to Moore's back pain is an MRI performed by Dr. Sills in 2006 revealing very mild degenerative disc disease. Dr. Muir, who reviewed the record, specifically

noted that the objective evidence found therein does not support Moore's allegations of severe pain and resulting limitations.  During his examination, he found that Moore's range of motion remained intact with full range of motion with no allodynia in the affected areas, no upper or lower motor neuron signs, and generally no features of a neuropathy, all seemingly contrary to the limitations identified by Dr. Nelson in his letters.  Again, this specific, legitimate reason for the ALJ's rejection Dr. Nelson's opinion is well supported by the record.

Moore argues that the ALJ failed to consider the fact that fibromyalgia[1] is not an impairment generally evaluated using objective evidence.  The only references to fibromyalgia in the record other than in Dr. Nelson's July 29, 2009, letter, are Moore's self report to a medical center in 2003 that she had been diagnosed with fibromyalgia, Dr. Nelson's suggestion to Moore in November 2005, that fibromyalgia may be playing a role her complaints, to which Moore responded that she had tried Mirapex in the past and it was not helpful, and Dr. Leong's mention of the diagnosis in Dr. Nelson's letter at the hearing.  Nowhere in the medical records is Moore diagnosed with, or treated for, fibromyalgia.  The testing upon which Dr. Nelson relies in his 2009 letter was performed by Dr. Muir, who did not diagnose Moore with fibromyalgia and found that Moore had no restrictions in terms of standing, walking, sitting or bending, and the ability to lift twenty-five pounds occasionally and ten to twenty pounds frequently.  Moore was not diagnosed with fibromyalgia during the relevant period and the ALJ did not err by failing to consider subjective evidence in support of this nonexistent diagnosis.

---

[1] "Fibromyalgia's cause is unknown, there is no cure, and it is poorly understood within much of the medical community.  The disease is diagnosed entirely on the basis of patients' reports of pain and other symptoms.  The American College of Rheumatology issued a set of agreed-upon diagnostic criteria in 1990, but to date there are no laboratory tests to confirm the diagnosis." *Benecke v Barnhart*, 379 F.3d 587, 590 (9th Cir. 2004) (citations omitted).

Moore also argues that the ALJ failed to take into account the value of Dr. Nelson's subjective observations of Moore's functioning.  In his 2009 letter, Dr. Nelson indicates that after Moore attempted to work cleaning houses on a part-time basis in 2007, "[s]he presented not only complaining of more pain but also in a more disheveled and anxious state."  (Admin R. at 386.) However, Dr. Nelson never indicated in his medical notes that Moore was anything other than in no acute distress, alert and cooperative, and with normal mood, affect, attention span, and concentration. Dr. Muir observed in late April, 2007, just a few weeks after Moore reported her part-time work to Dr. Nelson, that Moore was in no acute distress, not disheveled, able to walk to the examination room and move to the examination table from the chair, able to remove her shoes without difficulty, and sat comfortably.   Similarly, Dr. Sills, another treating physician, noted that Moore was in no acute distress and ambulated easily during the period he was treating her in late 2006.  There is no evidence in the record that Dr. Nelson, or any other doctor for that matter, ever observed Moore's alleged functional limitations.

The ALJ provided specific and legitimate reason for discounting the diagnoses and limitations offered by Dr. Nelson.  These reasons are supported by substantial evidence in the record. Accordingly, the ALJ did not err in discounting Dr. Nelson's opinion.

## II.  Moore's Testimony

The ALJ found Moore to be not entirely credible based on the absence of objective medical evidence in the record to support the intensity, persistence, and limiting effects of Moore's pain complaints.  In doing so, the ALJ relied heavily on reports from the examining and non-examining physicians as well as Moore's testimony regarding her daily activities.  Moore argues that the ALJ did not provide proper grounds for discounting her testimony, that he did not identify the rejected

testimony with sufficient specificity, that his grounds are not supported by the record, and that her testimony should be credited and this matter remanded for an award of benefits.

The ALJ's credibility findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995). Once a claimant shows an underlying impairment, the ALJ may not make a negative credibility finding "solely because" the claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence." *Robbins v. Social Security Administration*, 466 F.3d 880, 883 (9th Cir. 2006). In making credibility findings, the ALJ may consider objective medical evidence and the claimant's treatment history, including any failure to seek treatment, as well as the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge of the claimant's functional limitations. *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). Additionally, the ALJ may employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements regarding symptoms by the claimant. *Id*.

The ALJ found that Moore's medically determinable impairments would be expected to result in some limitations but not to the extent claimed by Moore. The ALJ pointed to Moore's own testimony, the absence of objective medical evidence, and the generally conservative course of treatment as inconsistent with the extreme limitations described by Moore as a result of her back pain. These are all proper reasons for discrediting Moore's testimony which are supported by the record.

Moore's assertion that she is disabled as a result of her back pain is belied by the record as whole, including some of Moore's own statements. As noted by the ALJ, Moore indicated that she

Page 32 - FINDINGS AND RECOMMENDATION                              *{SIB}*

is able to take care of herself and her two foster children, ages six and ten, when her husband is attending college or working part time on the swing or graveyard shifts, is able to drive the children to school and then run errands, prepares family meals and does household chores on a daily basis, walks two miles on occasion, and requires no assistive devices. The record also reveals that during the period in question, Moore cleaned two houses a week for two to three hours a day, volunteered at her church food pantry for an hour and a half on Wednesday and during the Sunday church service, was primarily responsible for taking care of the family dogs and cats, and worked in the yard at least once a month. These activities, when viewed as a whole, are inconsistent with someone who is severely limited by the constant, unrelenting pain described by Moore.

The only objective medical evidence in the record related to Moore's back pain is an MRI revealing only very mild degenerative disc disease. While the ALJ may not rely solely on this evidence to discredit Moore's testimony, it is proper to consider this as a factor where other indices of credibility are considered as well. In addition to the MRI, the ALJ took into account Dr. Muir's expert opinion based, in part, on his review of the record, including the MRI, that Moore was not limited in her ability to sit, stand, walk, or bend by her back pain. The ALJ properly used the lack of objective testing as merely a part of his credibility finding.

The ALJ also relied on Moore's relatively conservative treatment of her allegedly incessant, severe back pain as a factor in discounting her testimony regarding the degree of her limitations. The record reveals that Moore participated in two forms of injection therapy for her back pain. The nerve block injections provided 100 percent relief on one occasion but were otherwise unsuccessful. However, Moore regularly reported that the therapeutic injections provided at least some relief, that she was slowly improving, that the injections were doing her a lot of good, and that she was able to

decrease her pain medications as a result of the injections. Specifically, Moore went from doing "pretty good" in July 2005, to "feeling great" in August 2005. In February 2006, after continuing with therapeutic injections despite having to pay for them out of pocket, Moore reported to Dr. Osborn that the she had been doing well for six to seven weeks before experiencing an increase in pain, but then told Dr. Nelson the following month that she didn't feel the injections were helping her. Moore discontinued the therapeutic injections shortly thereafter.

After attempting the two forms of injection therapy, one of which was arguably successful, Moore did not pursue these treatments or alternative, more aggressive methods of treatment even after Dr. Sills offered Moore a number of other options. Rather, she merely continued treatment with assorted medications. Unexplained, or inadequately explained, failure to follow prescribed treatment, as well as failure to seek treatment, are acceptable reasons to question credibility. *Smolen*, 80 F.3d at 1284. The ALJ's consideration of Moore's willingness to treat her incessant, severe back pain conservatively with medication for ten years despite the arguable success of at least one alternative treatment, and the suggestion of two or three more, as a factor in discounting her pain testimony is appropriate and is supported by the record.

Moore argues that the ALJ improperly relied on the fact that she worked full-time in the family business until July 2006. To the contrary, the ALJ specifically found that Moore worked only eight hours per week in the family business after January 2006, and that she did not engage in substantial gainful activity during this period. Moore also contends that the ALJ's reliance on the fact she was able to work part time as a housekeeper after July 2006 was factually incorrect in that Moore testified at the hearing that she only cleaned one house for a total of three hours of work after July 2006. Moore's hearing testimony is contradicted by her statement to Dr. Nelson in April 2007

Page 34 - FINDINGS AND RECOMMENDATION                    *{SIB}*

that she was cleaning two houses a week, one on Tuesday and one Friday, each for two to three hours a day, as well as her written statement that when she cleans for five hours, she will be "wiped out" for a day or two, maybe three.  This is contradictory testimony is further support for the ALJ's finding that Moore is not entirely credible.

Moore also complains that the ALJ improperly relied on the opinions of non-examining physicians Kehrli, Berner, and Leong, which contradicted the opinion of Moore's treating physician, arguing that where the opinion of a non-examining physician is the only opinion contradicting the treating physician's opinion, the non-examining physician's testimony is not substantial and should be discounted.  Here, the ALJ relied heavily on the observations and conclusions of examining physician Dr. Muir, which were consistent with those of the non-examining physicians, in rejecting Moore's subjective complaints.  As an examining physician, Dr. Muir's opinion represents appropriate evidence to raise doubt about the limitations indicated by a treating physician.

Finally, Moore asserts that the ALJ failed to specifically address the issue of whether Moore could sustain activity for an eight-hour day and relies on *Reddick v. Chater*, 157 F.3d 715 (9th Cir. 1998) in support of this argument.  However, in *Reddick*, the court acknowledged that a claimant's testimony regarding her daily activities may be used to discount the claimant's claimed limitations when the level of activity is inconsistent with the alleged limitations.  *Id*. at 722.  Here, Moore argues that she is limited to fifteen or twenty minutes of activity at a time.  However, her own testimony establishes that during the relevant period, she was cleaning houses for two to three hours at a time, two days a week, and volunteering at the church for an hour a half twice a week.  Clearly, Moore's testimony is inconsistent with her assertion that she is only able to work in fifteen to twenty minute increments and the ALJ properly discounted Moore's testimony on her ability to sustain for

Page 35 - FINDINGS AND RECOMMENDATION                    *{SIB}*

less than two hours at a time without a break.

The ALJ's findings regarding Moore's credibility are sufficiently specific to permit and require this court to conclude they are not arbitrary.  Additionally, all of the findings are supported, at least to some degree, by the record.  The fact that the ALJ did not explain his reasons in detail, or to the satisfaction of Moore, is not grounds for rejecting the ALJ's finding or crediting Moore's testimony as true.

### III.  Don Moore's Testimony

Moore argues, and the Commissioner concedes, that the ALJ failed to give specific reasons for rejecting the testimony of Moore's husband, Don.  However, the Commissioner argues that: 1) Moore's and Don's testimony is similar and that the reasons given by the ALJ for discounting Moore's testimony apply equally to Don's testimony; 2) Don's testimony is contrary to Moore's stated limitations and should be rejected; 3) Don's testimony was not based on personal observation in that he testified that he was attending college and worked part-time on swing or graveyard and could have been discredited on these grounds; and 4) the ALJ's error was harmless because all of limitations identified in Don's testimony were incorporated into the residual functional capacity.

The ALJ has a duty to consider lay witness testimony.  20 C.F.R. §§ 404.1513(d); 404.1545(a)(3); *Bruce v. Astrue,* 557 F.3d 1113, 1115 (9th Cir. 2009).  Friends and family members in a position to observe the claimant's symptoms and daily activities are competent to testify regarding the claimant's condition.  *Dodrill v. Shalala*, 12 F.3d 915, 918 - 919 (9th Cir. 1993).  The ALJ may not reject such testimony without comment and must give reasons germane to the witness for rejecting such testimony entirely.  *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996).

Don testified that when Moore left the muffler shop due to exhaustion or pain, she would go

Page 36 - FINDINGS AND RECOMMENDATION                                            *{SIB}*

home and lay down to get some rest or sit and watch television. After the muffler shop closed, Moore stayed at home while Don attended school and worked part time. Don explained that Moore typically spends her days watching television, caring for the foster children, making dinner, doing laundry, cleaning the house, and taking care of the family cats and dogs. However, he stated that Moore is usually able to work for only fifteen to thirty minutes before sitting down to rest. On a good day, she is able to work for an hour or two at a time but is then down for the rest of the day. He testified that Moore can lift only ten to fifteen pounds, can not bend often or reach far, and can walk only a half mile at a time. While the ALJ acknowledged the relevant portion of Don's testimony, he did not provide reasons for rejecting the severe limitations described by Don. This was clear error, as conceded by the Commissioner. None of the Commissioner's attempts to justify the ALJ's failure to specifically address Don's testimony have merit.

The Commissioner argues that because Don's testimony is consistent with Moore's testimony, which the ALJ properly rejected, the reasons given for rejecting Moore's testimony apply to Don's testimony as well. However, Don's testimony on Moore's limitations is more restrictive than the limitations described by Moore, who indicated that she is able to walk for two miles, can be up and active for one to two hours before needing to rest for a half hour, and is able to lift twenty-five pounds. Therefore, Don's testimony is not consistent with Moore's testimony. Furthermore, the case the Commissioner cites as authority for this argument is not relevant. In *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009), the court held that where an ALJ gives similar reasons for discrediting consistent testimony of both a claimant and his spouse regarding the claimant's limitations, a finding that the ALJ provided clear and convincing reasons for discrediting the claimant's is equally applicable to the testimony of the claimant's spouse. Here,

the ALJ did not give similar reasons for rejecting the testimony of both Moore and Don. He did not give any reasons for discrediting Don's testimony and, in fact, did not address that testimony at all.

The Commissioner then changes course and argues that because Don's testimony is inconsistent with significant parts of Moore's own testimony, the ALJ would have been justified in rejecting Don's testimony as contradictory to claimant's activities or other objective evidence in the record. The court agrees that rejection of Don's testimony based on the fact that it is inconsistent with objective evidence, as well as the claimant's own testimony, would have met the standard and been supported by the record. However, the ALJ did not make such a finding. Other then summarizing Don's testimony regarding Moore's limitations, he totally ignored such testimony. It is the role of the ALJ, not the court, to provide the specific reasons for rejecting lay testimony. *Dodrill*, 12 F.3d at 919. In other words, this court cannot review and affirm the decision of an ALJ on a basis he never invoked. *Pinto v. Massanari*, 249 F.3d 840, 847 (9th Cir. 2001)("[W]e cannot affirm the decision of any agency on a ground that the agency did not invoke in making its decision."). Similarly, while the court agrees that the ALJ could have discounted Don's testimony on the ground that Don did not personally observe Moore's daily activities while he was away from the home attending college or at work, the ALJ never indicated he relied on this ground in rejecting Don's testimony. In the absence of a statement by the ALJ regarding his reasons for discounting Don's testimony, the court is unable to find that the ALJ properly rejected this testimony.

The Commissioner argues that the ALJ's failure to properly reject or consider Don's testimony is harmless error. This argument is not supported by the record. The court may not affirm a disability decision in light of a silent omission of lay witness testimony unless it can confidently conclude that no reasonable ALJ, when fully crediting the omitted testimony, would reach a different

disability conclusion. *Stout v. Comm'r*, 454 F.3d 1050, 1055-56 (9th Cir. 2006). For example, had the ALJ fully credited Don's testimony, he would have limited Moore to working fifteen to thirty minutes at a time before needing to rest. Instead, he found that Moore was able to stand, sit and/or walk for six hours in an eight-hour day with normal breaks. He described normal breaks as occurring every couple of hours with short additional breaks to use the restroom or get a drink of water. This is clearly contradictory to Don's testimony that if Moore works more than an hour or two at a time, she is unable to work for the rest of the day. The ALJ's failure to properly reject Don's testimony was not harmless error. Accordingly, this matter should be remanded to the Commissioner.

IV.  Vocational Testimony

Moore argues that the ALJ erred by failing to include all of her limitations in the hypothetical posed to the vocation expert at the hearing. Based on the ALJ's failure to properly reject Don's testimony, the court agrees. The hypothetical posed to Granat, and upon which the ALJ relied in finding Moore capable for performing past relevant work, assumed that Moore was capable of working for a couple of hours at a time without rest breaks. In fact, when asked whether an individual who required frequent breaks to lie down or rest during an eight-hour day was employable, Granat indicated that such an employee would be terminated. The ALJ's failure to account for Don's testimony resulted in a legally inadequate hypothetical. Accordingly, the ALJ's step five determination is unsupported by the substantial evidence.

V.  Remand

Moore asks the court to credit Don's testimony as true and remand for an award of Benefits rather than remand for further proceedings. The decision whether to remand for further proceedings

or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211

F.3d 1172, 1178 (9th Cir. 2000), (*cert. denied*, 531 U.S.1038 (2000). The issue turns on the utility

of further proceedings. A remand for an award of benefits is appropriate when no useful purpose

would be served by further administrative proceedings or when the record has been fully developed

and the evidence is insufficient to support the Commissioner's decision. *Strauss v. Comm'r*, 635

F.3d 1135, 1138-39 (9th Cir. 2011), quoting *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004).

The court may not award benefits punitively, and must conduct a credit-as-true analysis to determine

if a claimant is disabled under the Act. *Id.* at 1138.

Under the "crediting as true" doctrine, evidence should be credited and an immediate award

of benefits directed where "(1) the ALJ has failed to provide legally sufficient reasons for rejecting

such evidence, (2) there are no outstanding issues that must be resolved before a determination of

disability can be made, and (3) it is clear from the record that the ALJ would be required to find the

claimant disabled were such evidence credited." *Id.* The "crediting as true" doctrine is not a

mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter

an award of benefits upon reversing the Commissioner's decision. *Connett v. Barnhart*, 340 F.3d

871, 876 (9th Cir. 2003)(citing *Bunnell*, 947 F.2d at 348). The reviewing court declines to credit

testimony when "outstanding issues" remain. *Luna v. Astrue*, 623 F.3d 1032, 1035 (9th Cir. 2010).

The ALJ erred by failing to address Don's testimony. However, it is clear from the record

that crediting the omitted evidence creates a conflict which much be addressed by the ALJ before

a disability determination can be made. The limitations described by Don are greater than those

described by Moore and similar to those described by Dr. Nelson, both of which were properly

rejected by the ALJ. The ALJ should be given the opportunity to address Don's testimony and its

relationship to other credible evidence. Accordingly, this matter must be remanded for further proceedings to address Don's testimony. If necessary, the ALJ must then revise his residual functional capacity determination and engage in step four and five analysis incorporating any revised findings.

<u>CONCLUSION</u>

The Commissioner erred in failing to consider or reject Don's testimony. Accordingly, the Commissioner's final decision should be REVERSED and REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Findings and Recommendation.

<u>Scheduling Order</u>

The Findings and Recommendation will be referred to a district judge for review. Objections, if any, are due **March 13, 2012**. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 27th day of February, 2012.


_____/s/ John V. Acosta_____
JOHN V. ACOSTA
United States Magistrate Judge